EXHIBITS

Scanned at Pinckneyville CC and e-mailed

7/25/24 _____ by _CB_ _25_ pages
Date         Initials   No.

Ex. A1 Grievance 01-21-036 pg1

Ex A2 Grievance  01-21-036 pg2

Ex. A3 Grievance 01-21-036 Grievance Officer/CAO response

Ex. B ARB resppnse to grievance 01-21-036

Ex. C Wexford's Provider Hanbook- 23 pgs

ExD D Lippert v. Jeffreys Consent Decreee, First Report of the Monitor 11/24/2019

Ex. E Healthcare Monitor 7th report,Lippert v. Jeffreys 12/27/2023

Ex. F rejected grievance 2581-09-22

Ex. G Counseling Summary

Ex. H Ofender Outpatient Progress Notes (OOPN) 08/15/2019

Ex. I Hearing screening

Ex. J OOPN 10/01/19

Ex. K OOPN 03/05/20

Ex. L Communication PLan pgs 1-4 03/16/21

Ex. M OOPN 05/29/20

Ex. N OOPN 06/30/20

EX. O OOPN 06/22/20

Ex. P Communication PLan pgs 1-4 06/25/20

Ex. Q OOPN 07/09/20

Ex. R OOPN 08/21/20

Ex. S OOPN 08/26/20

EX. T OOPN 10/08/20

Ex. U OOPN 10/29/20

Ex. V OOPN 11/06/20

Ex. W Grievance response 01-21-036 01/08/21

Ex. X OOPN 05/27/21

Ex. Y OOPN 06/15/21

Ex. Z Decloration-Mychell Zepeda pgs 1-2

Ex. ZZ Affidavit Francisco Zepeda

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER



# Wexford Health
SOURCES INCORPORATED

# Provider Handbook

## Physicians, Psychiatrists, Dentists, Nurse Practitioners, and Physician Assistants

Wexford Health Sources, Inc.
Foster Plaza 2
425 Holiday Drive
Pittsburgh, PA 15220

37

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER


**Wexford Health**
SOURCES INCORPORATED

# HISTORY OF WEXFORD HEALTH SOURCES

A division of the Bantry Group (located in Pittsburgh, Pennsylvania), Wexford Health Sources, Inc. provides medical management services in the correctional industry. The firm has over thirty-five (35) years experience in health services management, including long-term care, psychiatric, and substance abuse programs. In 1992, Wexford Health seized the opportunity to use this expertise in the corrections industry.

## I. Philosophy of Medical Practice

Wexford Health is an innovative medical management organization specializing in providing quality medical service to incarcerated patients. Incarcerated patients are wards of their respective state or county with no alternatives for care other than services the institution provides.

The circumstances that brought the patient to incarceration are irrelevant. The medical unit should provide an area where inmates are treated with respect and concern, even if "extra effort" is necessary to make that happen. Any attitude that demeans the status of an inmate-patient is unacceptable. Medical service is NOT the mission of corrections (though the institution is required to provide such). Medical care is a support service. The mission of the Department of Corrections is security and discipline.

## II. Our "Practice" Population

Our patients are inmates in correctional centers, having been convicted of various crimes against society - some of which were quite heinous. Our concern and responsibility is with their medical care. We are not the judges of their guilt or innocence.

Most inmates are cooperative. They want to complete their sentence and get on with their lives. They cooperate with medical instruction and are usually compliant. About 15% of any given population are marginally (or completely) uncooperative and create 90% of the health service demand. They are the challenge of medical management.

Often inmates have had little or no access to medical care prior to incarceration, and are not certain when or how to use the services. Some are embarrassed, and some just don't know what to say or ask. Their response to your service may appear unusual, or even bizarre. They often (more often than in private practice) will say what they think you want to hear, rather than what relates to their problems.

Inmates can be very manipulative. People in general manipulate their environment to their own end. Inmates tend to engage their environment with skilled adeptness. Every institution provides an "Inmate Handbook" listing the rules and conduct expected of the inmates. You should read and understand this document. Never take anything from or bring anything to an inmate. Do not authorize special privileges. Anything that raises a question about inmate relationships should be discussed with your health care unit administrator, or the responsible assistant warden.

In spite of their situation, inmates deserve to be treated with respect and concern. They were not raised in prison. How much respect you receive will be directly related to how fair, just and professional you are with your inmate patients. The inmate/physician relationship demands "fair and firm" – this garners respect. They are your practice - treat them as such!

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER



Provider Handbook

## LEVELS OF SERVICE

Medical and health care should be delivered by a team of medical professionals. The services are organized into levels of care as follows:

- **Self Care.** Individuals are personally responsible for seeking medical advice regarding their health care concerns. Inmates do not lose this responsibility. They are the managers of their general health and lifestyle. Every effort must be made to teach and reinforce personal responsibility.

- **Nursing Sick Call.** This service is provided daily by staff nurses. Inmates desiring to be seen usually sign up for Sick Call the day before. Often, protocols are used to guide the nurses triaging Sick Call. Such protocols should first be read and approved by the medical director. Once in use, they should be reviewed by the medical director to assure compliance.

- **Emergency Care.** Emergency care is available twenty-four (24) hours a day, seven days a week. Any inmate must have access to health care unit personnel for immediate medical service any time an emergency arises. Medical personnel (or teams) are also available to respond to a cell or other areas in the prison to meet medical needs. Another option for Emergency Care is referral to a local emergency department if a physician is not on site AND the medical personnel deems this appropriate, or if the needed medical service is beyond the capability of the unit personnel. Medical personnel must contact the medical director/designee first unless the emergency is life/limb threatening.

- **Doctor's Sick Call.** An inmate has the right to request to see a physician. This request should be honored within seventy-two (72) hours. Inmates seen in Sick Call by the nurses are frequently "referred" to Doctor's Call for evaluation, diagnosis, and/or treatment.

- **Specialty Care.** This is provided in various ways. This includes onsite clinics, offsite referral to their office, and emergency department or a hospital. Referral may be made to hospitals or ambulatory centers for surgery, specialized testing, or other services as indicated.

*Note: All referrals that are not an emergency must be discussed in Wexford Health's collegial review.*

### I. "Level of Community Care"

Both by contract and by decree of the federal courts, corrections departments must provide inmates' medical care that is "equal to that available in the local community." Generally this means "usual and customary" medical service. Although a program of comprehensive medical care is required, not every diagnosis mandates treatment, nor is repair done on every existing condition. The medical staff should identify medical conditions on entry, or as early as possible, and design a program of individual care that seeks to maintain inmate health during incarceration. Illness or injury occurring during, or aggravated by incarceration should be promptly and appropriately attended.

These objectives can be met in many ways, including proper classification, inmate education, alterative of work and recreational assignments, frequent observation and examination, adjustments of medication and/or diet, and adjustments of a multitude of other variables. Consideration should be given to any alternative therapy that protects the patient and is allowable in the correctional setting. *Please discuss with the regional medical director and/or corporate medical director any unusual alternative therapy being considered before it is started.*

Inmate health problems are considered somewhat like "worker's compensation" cases. If a condition occurs in conjunction with, or is aggravated by incarceration, it is the responsibility of the Department of Corrections (thus the medical contractor) to treat or correct it. Many inmates, however, enter with pre-

39.

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER



existing problems that require significant care. Random examples include diabetes mellitus, hypertension, cancer, chronic renal problems, cardiac disease, asthma, seizures, paralytic conditions, and many other significant debilitating conditions. Conditions that are pre-existing, chronic, and stable require monitoring only.

Longstanding problems, e.g., arthritis, old knee and ankle injuries, recurrent low back ache, flat feet, childhood eye problems resulting in amblyopia, presbycusis, hammer toes, "trigger fingers," persistent acne, tinea versicolor, inguinal hernias of long duration without complication, uncomplicated ventral hernias, uncomplicated umbilical hernias, and a multitude of other such conditions may receive minimal, but reasonable support or observation.

A.   Many variables must be considered when deciding a course of treatment. These include, but are not limited to the following:

B.   When (how long ago) did the problem begin?

C.   The chronicity of the problem

D.   Whether the problem initiated in the Department of Corrections, or prior to incarceration

E.   What is the problem?

F.   How long is the inmate's sentence?  When will he (she) be released?

G.   Will the treatment "make a difference?"

H.   Will it improve the inmate's function?

I.   Will the treatment make the care of the inmate easier for the medical or correctional staff?

J.   What is the simplest, most basic, and safest means of managing this problem?

As physicians of leadership representing both Wexford Health and the Department of Corrections where you work, you are responsible for providing a level of care that at least meets these requirements.

40.

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER



Wexford Health
SOURCES INCORPORATED

Provider Handbook

## STANDARDS AND GUIDELINES

### I.  National Commission of Correctional Health Care (NCCHC) Standards

Wherever Wexford Health Sources, Inc. assumes responsibility for medical care management, a concerted effort is made to meet and exceed the *Standards for Medical Care in Prisons and Jails* as established by the National Commission of Correctional Health Care. A copy of these standards is available in the office of your health care unit administrator.

### II.  American Correctional Association (ACA) Standards

Another important set of standards applied to health services are those of the ACA. The administration of the correctional department will be particularly interested that the medical staff comply with these standards.

### III.  Wexford Standards

Wexford supports the highest level of standards desired by the state/county where those services have been contracted. ACA standards are the minimal level acceptable to Wexford; however, the preferred level of care at least should meet NCCHC Standards. In many units, Wexford has met and operates under ACA and NCCHC.

### IV.  Contract Definitions

In any given correctional care facility, the services required, the standards of care and the quality assurance expected are defined in the negotiated health service contract. The health care unit administrator will have a copy of that specific contract. These definitions must be met to assure continuation of Wexford as manager of the services.

### V.  Chain of Command

It is imperative for all providers to understand the various organizational charts and reporting chain of command that exists at each facility. Please be sure to review the following chain of command structures in operations at your facility with your Regional Medical Director or site Medical Director:

A.  Security leadership (state or county)

B.  Medical leadership (state or county)

C.  Wexford medical leadership

D.  Wexford administrative and nursing leadership

### VI.  Using Protocols

Protocols may be developed and used to guide the care given by nurses. They are also used to guide nurses and the appropriate routines in the chronic clinics. All protocols must be approved by the unit medical director. As part of the unit Quality Assurance Program, both acute care and chronic clinic protocols (or a defined sample) will be reviewed each month by the unit medical director. Wexford has pre-prepared protocols that may be used or revised for use at the discretion of the unit medical director.

Approved by the Wexford Medical Advisory Committee on June 8, 2012

CONFIDENTIAL SUBJECT TO GENERAL PROTECTIVE ORDER

**Wexford Health**
SOURCES INCORPORATED

### VII. Professional Dress Code

How you dress has a direct relationship to how the inmates treat you. Patients, including and prefer the physician to dress in a professional manner. Discretion is given to the personal dress; however, as a general guideline, ties are appropriate, and blue jeans shou. Whatever the dress, be professional.

### VIII. Continuing Medical Education (CME)

Physicians, by the choice of their profession, should be lifetime students. Ongoing study remain current in medicine. The use of journals, libraries, approved textbooks, and o programs are encouraged. Arrangements may be available for you to attend medical edu please check with your Regional Medical Director for details. You are also encouraged to a programs offered by local hospitals and state medical societies.

A unit in-service training program should be led by participation of the physician sta support medical staff understands what you expect and learns your practice patterns, th they can assist you.

### IX. Relationships

Developing positive professional relationships with your medical staff, correctional staf specialists greatly helps to ease your work. Discussions about your patients' problems, trea developments, security, and other issues will help you and your staff better understand wl and when it should be done. Again, it is important to consider the public health and instit correctional medicine. The administrative directives of the Department of Correction documents that must be applied to your decision-making. Developing relationships with th is as important as the medical staff.

### X. Early Release from Custody for Terminally Ill Inmates

Wexford Health makes every effort to facilitate the early release of those inmates who terminally ill. A terminally ill inmate is defined as one who has been given a prognosis of le live. Physicians are requested to discuss individual cases with the facility medical accordance with state regulations, will submit recommendations to the correctional auth

### XI. Providing Medical Care to Staff

Wexford Health Sources carries general and professional liability insurance that "cc physicians, physician assistants and other health care staff for work performed on behalf The Company, of course, is contracted to provide care to the inmate population. The appropriate for a site physician to deliver care to a fellow employee or to a corrections of such care be "covered" under the existing insurance policy. Persons other than inmates care should be directed to their personal physicians. Exceptions would include: 1) in emergency where immediate care is needed, and 2) routine services that may be include contract, i.e., routine immunization of corrections officers.

42

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

Provider Handbook

# HEALTH CARE ROLES

### I.   Corporate Medical Director

The corporate medical director is primarily responsible for medical policy development, professional development, and quality assurance. A further role is support and oversight of the utilization management process. You are welcome (and encouraged) to contact the corporate medical director for any assistance or questions you may have regarding medical policy or decision-making.

### II.   Regional Medical Director

The regional medical director is the immediate supervisor for the unit medical director. He conducts peer review on the unit medical director and assists in some utilization management issues, at the discretion of the corporate medical director.

Note that the unit medical director conducts the peer review on unit staff providers and is responsible for their peer review (excluding psychiatrists). Generally, peer review should be performed at least annually by the regional medical director (or his designee) and the unit medical director or as designated by the DOC/county. All peer reviews should give feedback to those healthcare providers being reviewed and must be kept confidential. A copy of the peer review should be forwarded to Wexford's credentialing department for use as a reference during the reappointment process.

### III.   Agency Medical Director

In states where the Department of Corrections has an agency medical director, that position has the prime responsibility for establishing medical policy. The corporate medical director will assure that all corporate medical policies comply with the state medical directives. All unit medical directors will keep both the regional and the agency medical directors informed of critical problems. The regional medical director should be contacted first to allow for internal resolution of as many problems as possible. Discretion is given, however, to unit medical directors to directly contact the agency medical director when it seems appropriate.

### IV.   Correctional Staff

Cooperation with the correctional staff is expected and necessary. The medical program in a prison system has a role similar to the military - it is a support element, not the primary force. Every institution has a set of DOC/county policies, usually called administrative directives as well as Wexford's own set of operational policies. In both case, some of the policies apply to the medical and mental health services. You must be familiar with all of these policies.

The warden of a prison unit is responsible for everything that happens in the unit. Although on occasion a medical decision may be in conflict with his (her) express wishes, most decisions should respect his (her) management responsibility. Usually an assistant warden is responsible for the medical service area, and you will work most directly with that position.

Security is the prime objective of all prison operations, and you are expected to understand and respect that responsibility. Security is the first issue of concern to most correctional staff. On occasion, security and health service are in conflict. These issues must be addressed on an individual basis. Decisions of this nature require your use of reasonable judgment. We depend on you to understand both the medical and security roles.

43.

**Wexford Health**
SOURCES INCORPORATED

Pr

## V.  Pittsburgh and Regional Staff

The Pittsburgh and regional staff are meant to provide support and resources to the unit op
not available to make the decisions that should be made at the unit level. The best clinic
decisions are made by the staff closest to the patient.

## VI.  Health Care Unit Administrator (HCUA)/Health Services Administrator (HSA)/Site

For optimal unit efficiency, the key leadership personnel need to become a tightly knit team
objective of providing high quality medical service at the best possible price. The administra
unit is the health care unit administrator (HCUA)/health services administrator (HSA
manages all the administrative aspects of the medical operation. He (she) deals most freq
corrections staff, regional staff and the local health service administrators.

Since the administrator is expected to manage all the unit administrative details and orch
functions, it is easy to understand the necessity of developing a close and interdependent r
this person. The HCUA/HSA deals extensively with the correctional staff and solves most of
problems. He (she) is the one most likely to represent your interests and/or concerns to
staff.

For the most effective, efficient and rewarding operation, you, the HCUA/HSA and the D
supportive interdependent team.

## VII.  Director of Nursing (DON)

The Nursing Director provides the leadership, training and nursing direction to the staf
responsible for assuring the nursing staff is capable and attentive in their efforts to provi
inmate nursing care. She is responsible for the staff schedules and the in-service training.
the medical director with the quality assurance responsibilities.

A close working relationship with the DON would greatly ease the medical director's jo
constant access to the inmate needs from her staff. The "daily reports" from her staff g
communications flow. This position can be a great help to your work. Respect this positio

## VIII.  Support Medical Staff

If you are the medical director, you may have the responsibility of managing staff physi
expect to be considered as colleagues. They will have variable abilities. Learn to understa
strengths and support that skill. If they need skill training, arrange it. There may be other
or physicians at another unit who can teach; or you can send the physician to a sem
program. Encourage them, have faith in their decisions, tell them what is expected and exp
them with your confidence in them.

Occasions will occur when you must correct or discipline them. Explain what caused the p
a problem, and how it must be corrected. Many physician problems in the correctional med
problems for the medical service, the DOC, and the individual physician. Therefore, pron
important.

Physicians, by nature and training, are independent, strongly self-motivated persons with a
analyze events and make decisions. These abilities are positive and desirable. They also
EGO feelings. Although, as medical director, you will spend considerable time managing
must also respect them and learn how to direct them in a positive direction.

44.

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER



**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## IX. Community Physicians

Since it is not feasible to provide all the necessary medical services within the institution, Wexford depends on the skills of community physicians. These physicians are usually sub-specialists, emergency physicians or obstetricians. They supply specialty services and hospitalizations; offer procedures and evaluations; and direct consultations. They not only fill important service needs, but they also bring a private practice perspective into the institution that adds validity (or reinforcement) to the decisions of the correctional medical staff. If you practice appropriate medical care, they will reinforce your medical decisions.

**Note:** Every effort must be made to use Wexford Health's contracted providers. The use of community physicians must be discussed in the collegial review process.

Even though we depend on the services of the private community physicians, this is a referral relationship. You are not "giving up" the patient. The referred inmate is still your (and the DOC's/county's) responsibility. The specialist has a responsibility, as in private practice, to inform you of the treatment plans, proposed surgeries and the medical strategy being considered for the patient. They must send you prompt reports of their care.

As in private practice, it is important for you to inform your consultant of the patient's history, physical and laboratory findings; and your reasons for referral. You also have a legitimate right to disagree with a specialist's position. Do not abdicate your medical judgment simply because you are referring a patient. Most of the time, you will agree with the consultant, but do not hesitate to disagree if you have a reason. Discuss the difference of opinion with the consultant. Often, circumstances of the confinement or security are not understood by the consultants. You are expected to understand these issues and work around or through them. DO NOT BLAME THE PROBLEM ON THE DEPARTMENT/COUNTY - simply explain that you have policy responsibilities that must be addressed.

If you do not understand a policy, either an institutional or a Wexford policy, ask for an explanation. Often, the policies are in place to protect the staff and finances of the community providers. We place a high priority on protecting the community providers.

When an inmate has been admitted to a local hospital, call the attending physician daily and check on your patient. You need to understand what is happening, and they need to know you are interested. You must initiate discharge planning immediately and explain your infirmary capabilities. No one will fault you for being interested in your patient.

4/5.

**Wexford Health**
SOURCES INCORPORATED

Pr

# MEDICAL ADMINISTRATIVE PROTOCOLS

**I.    Inmate Interview Tips and Techniques**

    **A.    Basic Points Directly Affecting the Interview Process**

        1.    Inmates are patients and deserve to be treated as patients.

        2.    Some inmates do not know how to relate to health professionals, thus their c... communicate may appear bizarre.

        3.    As a group, inmates are extremely manipulative.

        4.    Generally, the "tighter" the assigned security housing, the greater the inmate... health services. Death row inmates are usually an exception to this. They us... demonstrate medical usage directly proportional to their identified medical p...

        5.    To some inmates, medical service is the only area where they feel they have s... control. Thus, answers and actions may reflect control efforts rather than me...

        6.    Corrections officers (CO) sometimes intervene with the interview process. The...

            a.    They must be present - to protect

            b.    They can't remove the restraints

            c.    They must assure security

        7.    Medical staff too often assume a CO's role by becoming very directive; or atte... enforce security. CO's too often assume medical roles by judging inmate med... prejudging the presence or absence of illness.

        8.    Each level of medical team support tends to feel they know the inmates bette... trained professional who is their supervisor (also, jumping two supervisory le... mysteriously anoints an assistant as an absolute expert). Positive support for... very important.

    **B.    Interview Techniques**

        1.    As much and as often as possible, an inmate deserves privacy during intervi... examinations. Such expressions of personal dignity and respect are limited i...

        2.    Have as much knowledge as possible at hand when you start the interview. F... inmate chart (if one is available). A few minutes of chart review will save you... duplication of work and evaluation.

        3.    Listen CAREFULLY to inmate complaints and descriptions of their problems. ... accept their claims and descriptions, but maintain a healthy amount of doub... Remember, the most difficult diagnosis is the separation of the presence from t... pathology. "Does this patient truly have a medical condition?" is a tough que... Not all inmates are being manipulative. Many are correct in their description... incorrect, but truly believe some condition exists (seizures? asthma?). Some ... to tell you nor how to describe their problems. Since they are seeing a docto... they *should* "have something." No diagnoses = no treatment. Observation ma... course of action.

        4.    Require the inmates to relate detailed descriptions of evaluations and treatm... received when pre-existing conditions are claimed. Document those descripti... verbatim as possible. Document all medical devices, prosthetics, and medica...

4/6,

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

Provider Handbook

brought to the facility by the inmate. Have the unit staff obtain outside records on all problems claimed by the inmate.

5.  Be careful of promising treatment, surgery, or relief. You may not be in a position to deliver what is promised. There are many contingencies over which you have little or no control. Be fair - be just - but be honest.

6.  Do not generate interpersonal "games" with inmates. Taunting, teasing, and use of oblique innuendo are poorly understood and usually misinterpreted by inmates. They have a high level of negative suspicion as a protective tool.

7.  Inmates may exaggerate their conditions. On the other hand, understating significant aspects of their health conditions is equally common, e.g., denial of serious diabetic problems or past high-risk activities, IV drug use or homosexual activity, etc. Often the presence, or absence, of signs found at physical exam or by chart review helps to sort out inconsistencies. The best tool you have is a sensitive, professional and analytical review of each inmate's status.

8.  DO NOT EVER explain symptoms you would expect to see to confirm a diagnosis to an inmate. If you should, those symptoms will likely be present with the next visit. Do not prompt, lead, suggest, or describe symptom sets. Prison life is a special social society with its own special sets of rules. The inmates discuss their treatments and symptoms and compare the care they get. Interview technique should be non-directive with personal descriptions being encouraged and RECORDED. What happened? How did that bother you? Did you have pain? Where? Was that the only place it hurt? What did your doctor say? What did they do? How did you respond? Did the treatment work? How long? This method is more time consuming, but overall it requires less total effort and follow-up.

9.  Be straightforward with inmate patients. If their "problem" doesn't require treatment, tell them that, and stick to your decision. Treat or recommend on the basis of identified medical need. Any inmate can demand all sorts of treatment or situations, but their demands - in the absence of a medical need - do not justify supplying the service. Again, be sensitive and analytical. Never withhold a service whether demanded or not, as a punishment, nor to manipulate the inmate. Since the inmates are incarcerated as wards of the state, they have no medical alternative, and therefore require more patience and latitude from the health care professional. Do not promise what you may not have the authority to deliver. Frequently, inmate non-compliance or over utilization is due to poor understanding of their problem; weak or superficial explanation, or simply neglect on the part of the medical staff to deal with the inmate or his problem in a direct manner.

10.  Look for specific symptom sets and discipline yourself to require the inmate to identify and validate those symptoms as he describes his medical history. Then back up the history with corroborative physical findings and/or laboratory testing to assure yourself that a condition actually exists. We are all aware that disease states vary from patient to patient; the basic uniformity of major disease presentation and expression is incredibly standard. Remember the old medical school adage, *"When you hear hoof beats in the street, don't think of zebras."* Deliver service on the basis of identified medical need, and you will be offering excellent care.

## II.  Charting Technique

A.  You have spent years with medical charts. Nevertheless, you will find this presentation of Wexford's charting expectations a helpful guide. A chart is an extremely important permanent document. It is a journal of social history. It is a linear set of snap-shots into the deepest shadows of personality. It is, above all, a legal document. Please respect its power.

B.  The chart is the medical service memory of what the patient told you, what you found on physical examination, what diagnostic strategies were used, and what treatment programs were applied.

**Wexford Health**
SOURCE INCORPORATED

Other practitioners will review your data and add theirs. In this institutional settin
CMT's, administrators, mental health personnel and other officials may make entr
Those entries provide you, as the medical authority, with multifaceted information
other means of obtaining. It is often important information. If you are not familiar
paramedical entries in the medical record, you will quickly learn the value of their

C.    Other than prepared forms for specific medical information, all routine entries sho
the "SOAPE" format. The Subjective (S), Objective (O) Assessment (A), and (E) Edu
components are placed on the left side of the progress sheet, with the Plan (P) com
on the right.

D.    Chart ALL inmate encounters!  Inmates will frequently stop you outside of the hea
seeking your opinion and advice. If those "curb-side consults" have any significance
inmate to come to the health care unit and formally address the problem. Do NOT
think is informal information without documentation. It will show up in some futu
when you least expect it.

E.    Record adverse events promptly and accurately. For example, refusals of treatmen
efforts to alter that decision; reasons for "no-show" at chronic clinics or medication
to you, other inmates or staff, seemingly bizarre statements or actions and activitie
contradict inmate claimed medical problems. These are but a few of the possibilitie
if it isn't recorded, it didn't happen!

F.    Keep your entries objective, descriptive, and concise. Personal conflicts have no pla
charts. Resolve conflicts before making a note. Leave your personal feelings for dire
Do not criticize either medical or correctional staff in an individual's medical chart.

G.    Write so others can read what you wrote. An illegible medical entry is worthless.
write legibly, print. If you can't print legibly - learn to print. Your entry is meant to
there is no communication if an entry cannot be read.

H.    Charts are CONFIDENTIAL information. Physician-patient visits are privileged infor
data are not for community discussion. Please help to keep the integrity of the med

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES, INCORPORATED

Provider Handbook

# HEALTH CARE UNIT SERVICES

### I.   Intake Reception and Classification (R&C)

Each inmate, when first incarcerated and at the start of the Reception and Classification process, is initially screened by qualified health care staff to identify the presence of any condition needing immediate attention; for example: pediculosis, insulin dependent diabetes mellitus, active seizures, acute asthma or an existing injury. If an inmate enters on a given medication, it should be continued until the condition is documented or validated through securing outside records. Other necessary treatment should be started as indicated or as indicated by the DOC/county.

Within fourteen (14) days following the intake screening, a complete history and physical examination should be completed, including whatever routine and other indicated laboratory and biometric testing is indicated to establish claimed problems. These data should be consolidated, a health status determined, and a care plan established to maintain the inmate's health during his prison stay. This is an excellent opportunity to address advance directives, if appropriate.

### II.   Preventive Care

Emphasis is placed on preventive medicine during the inmate's incarceration. Prison is institutional medicine with institutional exposures. The individual inmate must be protected, as must the inmate population. Immunizations (flu, pneumonia), educational directives, adjusted activities, alternate housing or work assignments are all part of the preventive options.

Inmates with pre-existing problems should have a plan designed to correct or keep the condition from becoming worse (see our explanation of pre-existing conditions presented later). The third preventive strategy is a system for frequent observation and early diagnosis. This is embodied in the following procedures for simple and frequent access to multiple levels of medical service. For specific unit operations, you should consult the policy and procedure manuals and the institutional directives in your institution.

### III.   Routine Ambulatory Care

There are three (3) basic service routes for Routine Care, 1) Sick Call, 2) Physician Call, and 3) Pill Call. A fourth, Chronic Clinics, could also be included here.

Sick Call is usually held by nurses or PA's. Inmates are usually required to sign up for the service indicating the reason for the request. Scheduled inmates are seen and screened by nurses or CMT's using authorized protocols. Only OTC medications may be used by these personnel, unless the specific protocol authorizes a legend medication.

If a screened problem is not covered by protocol and is beyond the skill of the triage, the patients are referred to the Physician Call Line. They must be seen within 72 hours of referral. If they are seriously ill, they may be seen immediately (see Emergency Service below) by the physician, or in his (her) absence, sent to the local hospital emergency room.

Physician Call is scheduled daily for the general population, and is held at least weekly in "lock down" areas such as administrative segregation or protective custody. This time is used by the physician for medical evaluations, follow-up treatments, clarification of symptom complaints, diagnostic study, etc. Physician Call in "Lock Down" should be limited to screening and the discovery of problems needing further attention. Identified problems should be brought to the health care unit later for proper evaluation and treatment.

49.

**Wexford Health** SOURCES INCORPORATED

Pr

Pill Call is scheduled delivery of prescribed medication, and may occur either inside the hea at the assigned cell blocks. This is managed differently at different units. Medication is u nurses or corrections medical technicians (CMT's).

## IV.  Emergency Service

Inmates have access to emergency service any time there is no scheduled service availa service can be provided onsite by whatever level of provider able to meet the level of care unit has sufficient equipment and personnel skill to meet the patient's problem, it should be If the facility, equipment, or skill level of the onsite personnel is inadequate, the patient ma to the nearest hospital emergency department.

If no staff physician is on site and the situation is life-threatening, the attending nurse decision to transfer the patient. In such an event, the unit medical director must be notifi possible time. Wexford must authorize payment for this service, so an Emergency Referral faxed to the Wexford Pittsburgh office as soon as reasonably possible.

## V.  Infirmary Care

The inpatient unit is available to provide limited medical and nursing services for patients problems in an inpatient setting. Inpatient services may include medical care, isolation, aid, nursing care and post-operative care. Patients may also be assigned to the inpatient housing. In-patient care is not used as a substitute to hospital level care (ICU, medical/sur or a licensed nursing care facility. It is generally recommended that all patients discha inpatient facilities be placed in the infirmary for observation, unless such a patient is deem general population. Clinical issues are the responsibility of the Site Medical Director operational issues are the responsibility of the Health Services Administrator and the Dir

## VI.  Chronic Care

Services are provided on site to monitor the status of inmates with identified chronic ill Chronic Clinics for patients with the following are normally required: cardiac-hypert asthma and seizures. Any other such clinic could be established at your discretion. generally defined by a mandated protocol. Any additional clinic should have a similar pro approved prior to initiation of the clinic.

Chronic Disease Clinics are normally conducted every three to four months, and prov preventive and prospective care of the patient's problem. Refer to Wexford Health's Chronic manual for further guidance on Chronic Care.

## VII.  Specialty Care

It is impractical to have specialists in every unit, so arrangements are made to support th services with specialty consultation. Actually, you may seek consultation for an inmate in is medically indicated for an inmate. The key issue is medical necessity. Many inmates specialist for minor events, or just to get a second opinion. If you, as responsible physician services are indicated and identify a medical need, the case must be discussed in colleg review the utilization management policies and procedures for all offsite care.

### A.  Onsite Specialty Care

At some units, specialty physicians come on site and hold scheduled clinics. This is fr with orthopedics, general surgery and optometry. This allows more inmates to be setting, and decreases the transportation demands on the department. The special becomes more familiar with the inmates and the requirement of the correction

50.

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

**Provider Handbook**

physicians are "consultants" and require supervision by the facility medical director for appropriateness of recommendations.

B.  **Offsite Specialty Care**

When specialists are not available for "onsite" clinics, inmates may be scheduled to be seen in the specialist's office, in the local hospital emergency department or other ambulatory care facility. All such referrals must be arranged through the corrections department, and pre-approved through Wexford's utilization management/collegial review process. Every effort must be made to use contracted providers.

## VIII.  Hospital

At times, specialty care requires hospitalization. This may be requested on either a routine or emergency basis. When an emergency admission occurs, Wexford must be notified as soon as practical. Scheduled admissions should be requested through routine utilization management/collegial review. Such requests should clearly identify the medical necessity for the admission - beyond "the inmate agrees to (or wants) the surgery."

The recommendation for a procedure (or service) by a specialist should be given significant weight when deciding to provide that service; however, the unit physician must agree that such a procedure is indicated and necessary. All inmates are the patients of the medical director, NOT the specialist. Using a specialist does not remove the unit physician from the primary responsibility for care. The specialist does not (or may not) understand the special requirements of the correctional setting, and you must make treatment decisions within that context. In addition, the treatment or repair may not be the responsibility of the Department of Corrections. That is an interpretation you must make.

## IX.  Hospital Care

As reflected above, hospital care is a necessary part of our responsibility. This is done in many ways; however, most of the time, this is done by referral. Again, referral for hospitalization does not remove you from responsibility for the patient. Speak to the consulting physician to whom you are referring the patient. Learn of his (her) treatment plans and jointly create the discharge plans. Follow up on the status of the patient, and inform the physician of the capabilities of the unit to provide convalescence or other care.

Make arrangements to get an immediate discharge summary when the patient is released.

## X.  Dialysis

Some units have dialysis units where inmates may be dialyzed when the management and control of their end stage renal disease has exceeded the ability of the unit staff. Acute dialysis for toxic overdose or acute renal failure is usually accomplished through hospital referral.

## XI.  AIDS

Testing to identify HIV positive inmates, with further testing to validate the presence of AIDS, varies depending on the statutes and regulations of the state where you are assigned. All services that are needed to diagnose and treat AIDS are made available. Efforts are made to share and keep current on the status of AIDS trial and treatment. Some departments are still very sensitive about AIDS data, and keep all information as confidential as possible. As with other illnesses, confidentiality must be maintained.

## XII.  TBC (Routine, MAI, Multiresistant)

All inmates receive screening TB skin testing upon admission to their institutions. Follow-up testing is usually done annually. Each institution has a TB program to identify, follow up, and treat inmates. This is

57.

Approved by the Wexford Health

**Wexford Health**
SOURCES INCORPORATED

an important surveillance program. In the face of AIDS immune incompetence plus a
completion of INH therapy, the incidence of resistant TB is rapidly rising. Every diligent eff
to protect our population from TB. Remember, inmates leave the prison and carry their
communities.

## XIII. Pharmaceutical Service

Medications are provided through the pharmaceutical service. Medication may be ordered l
ARNP, physician assistant (with the approval of the medical director, 2) a nurse/CMT u
protocol when the medication is included in the protocol, or 3) using the approved protoc
counter (OTC) request.

The authorized medications are included in an approved formulary. Although som
medication may be used, all efforts must be made to adhere to the official formulary
provided in a blister-pack format.

Please be judicious in the prescribing of PAIN MEDICATIONS due to potential of abuse. Th
population, and the majority are incarcerated for drug-related crimes. The use of hard nar
not forbidden, but should be stringently controlled. These meds become a valuable trade
More are traded than are ever taken by the intended patient.

Stop dates should be written on all orders. Our patients may know more than all of us a
and disadvantages of these medications.

Medication should be prescribed based on indications and using objective findings as a gui
on a patient's subjective complaints.

A Pharmacy and Therapeutics Committee is part of the ongoing QA of a unit. Medicatic
changes can appropriately be made in that meeting.

## XIV. Laboratory Service

Routine laboratory services are available on site. A reference lab is contracted to provide
Any appropriate test may be done. Please share the results of your testing with your inm
lab services are available through the local hospital and should be utilized only if medic

Specimen collection should be done under closely controlled conditions. Any urine sa
complaints of "hematuria" must be collected under direct observation of the MEDICAL S

## XV. Radiology Service

Routine radiology may be done on site or at the local hospital. Do not initiate any contrast i
unless you are able to manage the adverse impact of allergic reaction. This does not occu
any such occurrence can be devastating.

Not many conditions require immediate radiographic procedures. As you know, with cert
situations (e.g., sprained ankles, routine chest films, head injuries in young people, kno
high percentage are "normal" or non-contributing to the evaluation. When these
inconvenient times, e.g., evenings or weekends, it is rarely necessary to get immediate radi
The patients may be placed at bed rest; the area immobilized, iced and elevated and x-
soon, but at a more convenient time. Of course, circumstances occur when the degr
sufficient to require immediate review. Such decisions are left for you to discern and jus

You may not be a radiologist, and Wexford does not expect you to be the definitive interpre

52.

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## ADMINISTRATIVE SERVICES

### I.   Policies and Procedures

The basic policies guiding the correctional operations are found in the department's administrative directives where you are working. It is vital that you read, know and develop the medical operation within the guidelines of these directives. There will be a section that addresses the general operational policies of the medical unit. Specific medical operations in your assigned unit are described in the institutional directives of each individual unit.

Wexford provides a set of medical policies and procedures as well as operational policies from which the medical staff can develop their own. These are prepared with cross-references between the various standards to facilitate compliance.

### II.   Referrals

As part of your medical support system, you will be requesting referrals to specialists, sub-specialists, emergency departments, hospitals, ambulatory facilities and other providers. Each referral requires a collegial review along with a utilization management form to be completed and submitted for an authorization number. That number authorizes Wexford to reimburse for the service.

If you decide a referral is indicated, complete the referral form with brief but pertinent information about the case and what is being requested. The following discussions will give you a sense of the considerations for making decisions about referrals. The initial portion deals with a most difficult decision area - appropriate care for pre-existing conditions.

53.

**Wexford Health**
SOURCES INCORPORATED

P

## PRE-EXISTING MEDICAL CONDITIONS

I. **The Basis for Care**

A.    Upon incarceration, the inmate becomes a ward of the state. The DOC becomes the
each inmate, and has *"parental"* responsibility.

B.    Incarceration limits the *"medical alternatives"* of the inmate, thus incurring a high
from the medical service.

C.    The DOC/county (and medical contractor) is prohibited from practicing "deliberat
to serious medical needs" in the course of medical service. We are obligated to pr
necessary care consistent with community standards.

D.    By means of contract definition (and the support of federal court decisions) medica
interpreted as "comprehensive medical services equal to those available in the loca
It is understood that *"local community"* may be more liberally interpreted as the cu
the art as generally practiced across the country.

E.    Contracting for medical service does not relieve the state of their responsibility as
inmate. The medical service contractor has a direct responsibility to represent the
proper provision of medical services to the inmate. Also, each medical staff membe
responsibility to respect the inmate's civil right for reasonable medical service.

F.    The *"deliberate indifference"* term is not a mandate *"to cure;"* it is a mandate requir
addressed in an appropriate and professional manner. Further, the dictum relates
is to be directed to *"serious medical need."* Conditions of lesser significance, of cou
be neglected. (By association, such neglect could and should be suggestive that se
might also be neglected.) But the major concern was for serious medical needs - tl
threatening a patient's life and/or limb.

II. **The State Department of Corrections Responsibility**

A.    As generally noted above, the state becomes the *"guardian"* of the inmate. Therefor
provide a comprehensive medical service equal to *"that found in the local community*
private contractor is utilized, that contractor must meet the same responsibility re
state. Thus, decisions made by the medical contractor reflect the state's role.

B.    Wexford Health's practice philosophy is to provide the required comprehensive me
*"equal to* (or better than) *the level available in the local community."* The program is
designed to support with preventative care those inmates who enter with pre-existi
conditions.

C.    Inmate problems in the institution are treated with a *"worker's compensation"* phil
conditions which occur in the DOC, or which are directly aggravated by incarcerati
responsibility of the DOC.

D.    However, inmates present with many conditions that are totally unrelated to their i
Many of these conditions have never been addressed prior to incarceration. Many b
diagnosed and treated prior to incarceration. Many inmates claim to have been dia
treated, but no evidence can be found to validate the problems. For some condition
cosmetic problems, it is rarely appropriate for the DOC to accept a treatment respo

54.

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

E.   The state does NOT have a responsibility to provide a service simply because an inmate demands it be done. Nor does the state have a responsibility to CURE, only to appropriately diagnose and treat.

## III.   Individual Responsibility

A.   Understanding that the state has a *"guardian"* role to care for the inmate, and the inmate has limited alternative choices for medical service, there is still a major personal responsibility on the inmate to seek to preserve his/her health. This means an inmate is responsible for complying with medical plans and treatment prescribed.

B.   The inmate is responsible for personal hygiene and other normal activities of daily living that promote his/her own health.

C.   Inmates have the responsibility to bring to medical staff attention the fact that they believe a personal medical problem exists.

D.   Inmates may refuse medical service, but their refusal does not speak to a *"deliberate indifference"* in that case. Documentation of all refused care is necessary and psychiatric evaluation of competency should be obtained when in question.

E.   All inmates have a *"public health"* responsibility to aide in the protection of the health of the other inmates. Just like citizens in *"free-world"* communities, they must submit to individual practices, which help assure the health of the institution, e.g., TB testing and treatment.

## IV.   Summary

No inmate who has a problem will be denied treatment simply because the condition existed prior to incarceration. Treatment will be offered on the basis of medical need, appropriate diagnosis and the degree of objective limitation of function. Further consideration will be applied to the treatment plan if incarceration activities might aggravate or hasten deterioration of the condition. Pain will be given serious consideration as an aggravating factor, but must be evaluated in the light of the patient's dependency history.

An additional factor with significant weight is the anticipated prognosis of the proposed treatment. Only if there is a reasonable expectation that the outcome of the treatment will make a significant difference for a reasonable duration will a procedure be given serious consideration. Recommended approaches that *"might give some relief"* are reviewed and considered, but are not given substantial support.

**Wexford Health**
SOURCES INCORPORATED

Prov

# QUALITY ASSURANCE

It is difficult to maintain a quality practice in correctional medicine. Staffing, equipment, security
cumbersome policies, conflicting operational objectives, unrelenting and often unrealistic inmate der
ever-present shadow of litigation combine to promote fragmentation and frustration. These vari
controlled by consistent leadership which identifies quality medical service, persistently pursues
goals and maintains the levels achieved. Part of that process is the candid review of error,
disappointing outcomes. If we do not face our failures, we will continue to fail through ignorance. Cor
through quality assurance serves to identify deficiencies and improves patient outcomes.

It is expected that all clinical providers (MD/Dentist/PA/NP) will actively participate in their
Management Program or meetings. The site Medical Director (or designee) will co-chair the Quality
Program meetings.

### I.    Peer Reviews

One responsibility of both the unit and the corporate medical director is the review of provide
Although this is usually physician - physician review, in our units, physician - nurse or CMI
included. Generally, peer review should be performed at least annually by the regional medi
his designee) and the unit medical director or as designated by the DOC/county. All peer r
give feedback to those healthcare providers being reviewed and must be kept confidential. A c
review should be forwarded to Wexford's credentialing department for use as a referen
reappointment process.

### II.    Death Reviews

The occurrence of an inmate death in the institution is always accompanied by suspicion. Th
inmates, and sometimes even DOC and medical staff are suspect that unusual events I
Realistically, death is inevitable. Most deaths are for obvious or expected reasons. Howevei
death must be reported as soon as reasonable to the regional office and the corporate medical
death is unexpected, or you perceive unusual events, immediate notification is indicated. Th
director must file a complete chart summary within a week of the day of death. This su
include: 1) patient identification, 2) all listed problems, 3) cause of death, 4) a history c
incarceration and medical care with an emphasis on the care preceding the death,
circumstances you believe accompanied the event, and any information from "outside" provic
that are important, and 6) all pertinent laboratory, radiographic, pathologic, or other studi

This report is both an informational and a legal document that becomes a part of the perman
part of our medical review. Please treat it as such. We expect a high degree of candor in the t
document. There is no place for unfounded incriminations or speculations. This must be a fai
with your best effort at reasonable analysis and detail. The degree of detail is left to you
thorough, but concise. Above all, include ONLY what is supported by existing, documented
evidence, and validated information sources.

### III.    High-Risk Population

The population of any Correctional Unit has "more" of almost any pathologic condition you w
The lifestyles, personalities, socio-economic pathology and circumstances of illegal traffic
huge physiologic price tag. As responsible professionals, we are here to maintain the bes
possible for as long as is reasonable. Personal judgments regarding the basis for the pro
place in the treatment of these problems.

56.

Case 3:19-cv-00681-NJR   Document 8   Filed 10/10/19   Page 83 of 113   Page ID #121
Case 3:22-cv-03040-GCS      Document 39     Filed 07/25/24     Page 22 of 25     Page ID
#600

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## ATTESTATION

I, _____do attest that the Wexford Health Sources,
Inc. handbook has been read by me. I understand and agree to abide by the procedures and
policies set forward in this handbook. Furthermore, I have been allowed to ask questions and I
have been given appropriate answers to those questions.

_____     _____
**Provider**                                                         **Date**

_____     _____
**Facility Medical Director**                               **Date**

_____     _____
**Regional-Level Operator**                             **Date**

_____     _____
**Regional Medical Director**                           **Date**

57.

Case No. ▮▮▮▮▮▮

WFX191

**Wexford Health**
SOURCES INCORPORATED

Pr

Patients with AIDS, end-stage renal disease, failing cardio-vascular support, uncontrolled dis and many other terminal problems that may generate from poor lifestyles should find reasonable comfort in the health care staff. These patients often pose the greatest cha healthcare staff. Nevertheless, we must extend our care and attention FAR beyond the usual practice. These patients have no place to go – YOU may be their final provider. Regardless of done, they deserve your best care. Judgment of their prior acts should be left to those cap judgment.

## IV. Experimental Care Services

Inmates may not participate in an experimental study without the specific written approval medical director. Further approval will be required by the agency medical director or the state Corrections.

## V. Transportation

Transport of inmates for outside medical service is usually the task of the Department of ( contractor, we are usually responsible for emergency transportation. However, these issues addressed in the contract.

## VI. Cost Considerations

A criticism frequently directed toward private managed care programs like Wexford Health are withheld to improve profits. Similar criticism has been directed at the medical indus implying that cost - money - should never be a consideration in regards to providing medical always been a consideration in treatment, and with progressive government "Health Car become a far greater factor than it has ever been under the "control of the health professio

Consideration in deciding treatment is given to whether or not the Department of Corre responsibility to provide a treatment. The mere existence of a condition DOES NOT C RESPONSIBILITY for repair

When considering alternative treatment approaches, cost becomes a consideration. Even the determinant, but only ONE of several possible variables considered. Cost, per se, usually be variable considered, belying its importance.

Meanwhile, the role of the medical staff is to: 1) provide medical care to individual patients, best quality we can afford and spread our health care budget to effectively cover as ma possible. Cost has been and must continue to be a consideration. The "cost of service" remain factor to be shouldered by each health care professional. Being fiscally responsible builds a br treatment alternatives.

58.

IN THE UNITED STATES DISTRICT COURT

FOR THE

SOUTHERN DISTRICT OF ILLINOIS

Francisco Zepeda, pro se )
   Plaintiff )
     v. )
Rob jeffreys, Dee Dee Brookhart, )
Lori Cunningham, Vipin Shah, )
Sarah Stover, et al., )
   Defendants )

No. 3:22-cv-3040-GCS

CERTIFICATE OF SERVICE

I hereby certify that I have e-filed through Pinckneyville C.C. Law Library
missing exhibit C  from response in opposition to summary judgment and exhibit
page totolling  24 pages including this page.

07/23/24

Francisco Zepeda, pro se Y30997
5835 State Route 154
Pinckneyville, IL 62274



Scanned at Pinckneyville CC and e-mailed

7/25/24  by  CB  25  pages
Date          Initials    No.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
prisoner esl @ ilsd.uscourts.gov

ELECTRONIC FILING COVER SHEET

Please complete this form and include it when submitting any type of document, letter, pleading, etc. to
the U.S District Court for the Southern District of Illinois for review and filing

Francisco Zepeda                    V30997
Name                                ID Number

Please answer questions as thoroughly as possible and circle yes or no where indicated

1.  Is this a new civil rights complaint or habeas corpus petition?          Yes or (No)

    If this is a habeas case, please circle the related statute:   28 U.S.C. 2241 or 28 U.S.C. 2254

2.  Is this an Amended Complaint or an Amended Habeas Petition?      Yes or (No)

    If yes, please list case number: _____

    If yes, but you do not know the case number mark here:    _____

3.  Should this document be filed in a pending case?          (Yes) or No

    If yes, please list case number:  22-CV-3040

    If yes, but you do not know the case number mark here:    _____

4.  Please list the total number of pages being transmitted:          25

5.  If multiple documents, please identify each document and the number of pages for each
    document. For example: Motion to Proceed In Forma Pauperis, 6 pages; Complaint, 28 pages.

    Name of Document                              Number of Pages

    Missing Exhibit C                              25
    and COS

    _____                     _____

Please note that discovery requests and responses are NOT to be filed, and should be forwarded
to the attorney(s) of record.  Discovery materials sent to the Court will be returned untiled.